Good morning, Your Honors. Megan Hoffman appearing on behalf of the appellant Shauntay Wheaton. I'm going to try to reserve two minutes for rebuttal. There's no issue in this case that Mr. Wheaton, Shauntay Wheaton, was only one month into his 15th birthday when he was arrested and soon thereafter subsequently sentenced to four life sentences. It is our position that there's no clear evidence in this record that Mr. Wheaton didn't understand the nature of the waiver or the, and definitely not the consequences of the waiver, when upon making an incriminatory statement, he asked the correctional officer whether he could go home to his mom after he had made these incriminating statements. Mr. Wheaton, as I mentioned, was 15 years old. As this Court of Appeals has determined, Mr. Wheaton was not a juvenile. And as the Supreme Court has noted in Duty v. Shryo, in which Your Honor Rawlinson wrote the opinion, as the Supreme Court recently noted in Graham v. Florida, in addition to a prior case, which was Roper v. Simmons, juveniles are different, and juveniles have different understanding of these types of circumstances, of these types of waivers. Often they don't understand the language of the waivers. And that's true in this case, where the school records demonstrate that Mr. Wheaton was not a sophisticated, savvy 15-year-old. In fact, Mr. Wheaton was below average in language, language mechanics, language composite. At the time that there was a, the State did argue that he had been read his Miranda rights in the past. At the time he was 12 or 13 years old, and the school records demonstrate that his prior school records demonstrated that he was below average in almost every single one of those factors, reading, writing, comprehension. Those things demonstrate that Mr. Wheaton himself was not a particularly savvy 15-year-old, and certainly did not understand the consequences or even possibly the language of the waiver that he gave. That factor was further complicated by the fact that there was no attorney present, there was no parent or guardian present, there was no friendly presence on Mr. Wheaton's behalf at the time that he gave this waiver. And in fact, the detective in this case admitted during the hearing on the Miranda motion that he made a conscious decision not to contact the parents in this matter, knowing that he, that Mr. Wheaton was a young age. Now, the detective at the time thought Mr. Wheaton was 14 years old, Mr. Wheaton, as I said, was only one month into his 15th birthday, but the detective admitted that he made that conscious decision to not contact Mr. Wheaton's mother or his grandmother. He also admitted at the hearing that the detective admitted that he treated Mr. Wheaton like a 40-year-old suspect of average intelligence, which simply was not the case in Mr. Wheaton, or of Mr. Wheaton's circumstances. Mr. Wheaton further believed that he was going to die. He told the detective he didn't want to die, and the detective told him, don't worry, you're not going to die, but never told him he wasn't going to be eligible for the death penalty, did not tell him that he was going to be tried as an adult. And Mr. Wheaton told the detective that he had never been locked up before and that he was not familiar with the adult charging system.    And he told Mr. Wheaton that he was going to die. How long was the interrogation? The interrogation was a little, I believe, a little over a half an hour, Your Honor. It was fairly short. Yeah. It seems to me you have a steep road to climb in habeas. It seems to me, and you can correct me if I'm wrong, but it seems to me you're really arguing for a rule that the parents have to be contacted before interrogating a minor. Your Honor, we recognize and acknowledge that this Court has found that there is no due process requirement that a parent be contacted. And Nevada has the same requirement. In Elvick v. Nevada, the Nevada Supreme Court recognized that it was critical, it was a critical fact to consider under the totality of the circumstances that the parents were not contacted. And in this case, I don't think the Court has to reach that conclusion. I don't think they have to overrule U.S. v. Doe. I think in this case, we can get to that place even under the higher standard in habeas in arguing that the Court did not consider the totality of the circumstances that were presented. You're saying that the factual determination was unreasonable? We argue the factual determination was unreasonable, but also the legal determination was unreasonable in the fact that under the totality of the circumstances, which is the legal standard in determining whether or not a confession is voluntary, that the Court also got that wrong. And in particular, one of those primary factors is that there was no friendly adult present. As I mentioned, the detective in this case was ñ knew that Mr. Wheaton was a child. There's no doubt in this case that he knew that he was a child. And that is distinguished. Yeah, but I'm having trouble finding a bunch of other factors other than the fact that the parents weren't contacted. It wasn't a very long interrogation. It wasn't a long interrogation. He was ñ we would submit that he was in a 4-by-6 room. He was chained to a table. He'd never found himself in this type of circumstance before. He'd never found himself in a small room with a large detective chained to a table being interrogated about whether or not he killed someone. In addition to that, Mr. Wheaton repeatedly discusses that he's really frightened of his co-defendant. I identified 1, 2, 3, 4, 5, at least 5 or 6 instances during the interrogation, albeit short interrogation, in which Mr. Wheaton indicated that he was afraid his co-defendant was going to kill him. And the detective used that knowledge and used that fear to coerce Mr. Wheaton into talking with him. And he was able to do that.   He was able to do that. Mr. Wheaton would say I'm really scared, I'm afraid my co-defendant is going to kill me. And the detective would say I can guarantee your safety or I can promise you that your co-defendant will not know that you talked to me. No one is going to know outside of this room that you talked to me. And that certainly is not what occurred in this case. Why don't you, would you, for my benefit, I think we understand your argument on that. Would you talk about the biblical reference? Yes. And in fact, Your Honor, I would argue that the biblical reference and also the prosecutorial misconduct of vouching in this case ties into the entire picture of Mr. Wheaton also giving a statement that was involuntary. And the reason for that is that, I'll start with the Bible quote as Your Honor requested. In this case, the defense in their closing argument focused primarily and solely on the fact of Mr. Wheaton's age to encourage the jury to recognize that Mr. Wheaton was a child at the time that these statements were given, was a child at the time that these crimes occurred. And in rebuttal argument, the first thing out of the prosecutor's mouth was the misrepresentation and the misappropriation of the Bible's authority on what is a child and what is an adult as an adult, as a child becomes an adult. But the prosecutor didn't specifically reference the Bible. He started quoting so if someone didn't know that this was from the Bible. And, Your Honor, I would argue that this quote, although, you know, is not as common as perhaps love is kind or love is patient, it's from that same chapter. And, in fact, this is a quote that was so common and so recognizable that the judge recognized it immediately. But not everyone would recognize it unless he said the Bible says because my law clerks didn't recognize it as being from the Bible, for instance. So unless someone is well versed in the Bible, they wouldn't have known that it was from the Bible. And the judge immediately recognized it and said that it should be disregarded. So why didn't that cure any harm? Your Honor, we would argue that it didn't cure the error in this case because it directly went to the heart of what defense counsel had argued in their closing argument, and it directly went to the heart of this case. Because the jury was given an instruction in this case that it had to determine the voluntariness of Mr. Wheaton's statements. And it also was given that instruction during or it was also argued that way during the closing argument, that if the jury was not to consider that Mr. Wheaton was a critical component of whether or not his statement was voluntary. And it also took out of the equation the fact that Mr. Wheaton was 15 years old. And we would argue that although this is not a Bible quote that maybe everyone would recognize, we also can't say that a couple of jurors didn't recognize it as a Bible quote and didn't take that into consideration. And that factor is one that went to the heart of Mr. Wheaton's defense in this case. One thing that you have not mentioned at all is that we are reviewing a Nevada Supreme Court opinion, and our requirement is to find that it is not, that that opinion is not contrary to or an unreasonable application of Supreme Court law. It's not that we're looking at it just initially from our standpoint. We're looking at it from the standpoint of what the Supreme Court ruled. That's correct, Your Honor. And we would argue that as to all of these factors, but going back to the Miranda issue to stop it, to begin with really quickly, we do argue that it wasn't a reasonable application of Miranda, and looking at this under the totality of the circumstances, Gallegos v. Colorado. And we also would argue that as to the Bible quote, this Court has recognized that the language must so substantially impact the verdict. And in this case, we argue that it did that. We argue that the Nevada Supreme Court, in particular, as to the Bible quote, found that it wasn't a recognizable quote and that there was no error, but didn't take into consideration the impact that it had on the jury's consideration of voluntariness and other issues in the case, as I've discussed and as were discussed in the briefing. The same would be true of the vouching argument that the Nevada Supreme Court, in particular, there was no curative instruction given on the vouching error, and so the Nevada Supreme Court determining, first of all, that there was no error, we would argue was a problem. But in addition to that, we'd argue that all of this together under Parle v. Reynolds creates an atmosphere of cumulative error that the Nevada Supreme Court and the district court in the Federal level overlooked and misapprehended under the facts given in Mr. Wheaton's case. Counsel, you are over time. Thank you. Thank you. Good morning. May it please the Court, my name is Alicia LaRue and I have the privilege of representing the respondents in this matter. I would like to begin this morning by addressing the issue of Mr. Wheaton's voluntariness of this statement. I want to dissuade this Court of any notion that Mr. Wheaton was this young, frightened, legally unsophisticated individual that has been portrayed. First of all, let it be known or recognized that Mr. Wheaton had on a previous occasion been advised of his Miranda rights and had signed off on his Miranda rights at that time. So this was not an individual who was new to the legal system. During the previous argument, it was mentioned that he had never found himself before chained to a table in a four-by-six room being interrogated. I would like to offer to the Court that very few criminal defendants have probably found themselves in that situation prior to an interrogation, and that should certainly not be a factor that determines the voluntariness of a statement. I would also like to point out that we are not just talking about the statement made to the investigating officer in this case. There were actually two confessions. The first was during the course of interrogation. The second was made during booking. That was not an interrogation. The statement was voluntarily made, and therefore it does not fall under Miranda. So even if that first statement was to be found involuntary, you still have a second statement, a second confession that was voluntary and that was not made during the course of interrogation. In addition, there were numerous pieces of evidence in this case aside from any confession that pointed to Mr. Wheaton's guilt. He was located blocks from the crime scene. He was identified by a witness. His bloody footprints were found at the crime scene. There were casings at the crime scene from a gun that was recovered with Mr. Wheaton in this case. And I believe that sums up the evidence that was against Mr. Wheaton. But in contrast to the Taylor case, which the appellants have relied on, in this case there were numerous pieces of evidence that were used. Turning to the issue of the prosecutorial misconduct, that issue and the Bible reference, the standard that this ---- Excuse me. Did the jury know that he was being tried as an adult? Did the jury know that he was being tried as an adult, Your Honor? I do not know whether the jury recognized that, but I believe that ---- I can't say with a certainty that the jury recognized that, but I believe that, yes, they did. As far as the issue of the biblical reference, the standard is whether that so The appellant in this case has represented that he was prejudiced, that Mr. Wheaton was prejudiced by that biblical reference. There's absolutely no evidence of prejudice. But do you agree that the main thrust of the defense's argument was that he was a child and, therefore, the jury should be merciful to him? I will agree that that was the main thrust of the closing argument. However, under Nevada law, the age is not a factor to take into consideration on guilt in a first-degree murder. But in closing argument, the defense is free to try to utilize any techniques that would help the jury to be merciful. So if the defense technique was to harp on the youth of the defendant, and then the prosecution came back with this biblical reference that negated the effort, why wouldn't that be prejudicial? Your Honor, the biblical reference was not made – it was a biblical reference. It was not identified by the prosecution as a biblical reference. It was presented to the jury as this individual should be held accountable for actions that were very adult in nature. If you look at the context of the total argument. Is that the argument that was made to the jury by the prosecutor? The prosecutor did argue that, yes, this individual should be held accountable for adult actions. And again, there was no actual citation to the Bible, and the court immediately gave an instruction instructing the jury to disregard that. Furthermore, jurors are presumed to follow jury instructions, and there was a written instruction instructing the jury that closing arguments are not to be considered evidence. Again, there is no evidence of prejudice with result to that biblical reference. Okay. If the court has any further questions, I will happily answer those. Otherwise, I believe that – One thing that surprises me is that both arguments treated as though we are looking at it anew, fresh, not after a Nevada Supreme Court opinion, an extensive one, was made. Neither of you have talked about the fact what our standard of review is in that circumstance. Your Honor, I do apologize for that. You are absolutely correct. On the factual findings of the Nevada Supreme Court, this court needs to find that they were clearly erroneous. There is no evidence that those factual findings were clearly erroneous. Mr. Wheaton, in his opening brief, points to the fact that the court did not address everything, all the evidence that was before it. However, the U.S. Supreme Court in Miller v. Cockrell has said that a court does not need to address every offer of proof. And then the application of the law, this court needs to find that the Nevada Supreme Court had an unreasonable application of the law. There was no unreasonable application of the law in light of the facts that were presented. What about on the vouching issue? Yes, Your Honor. On the vouching issue, the exact quote from the prosecutor was, first of all, referring to the eyewitness, was, first of all, she's an incredibly believable woman, I suggest to you. The prosecutor then went on to explain why he suggested that she was an incredibly believable woman, and that was based upon some dispute as to whether she actually had a clear line of sight to the crime scene. The trial court found that he was not improperly vouching for a witness because he was just trying to explain the evidence. The Nevada Supreme Court upheld that finding. Again, in light of the evidence, he was simply explaining to the jury why she should be found to be believable and credible. Does the Court have any other further questions? There don't appear to be any. Thank you. Thank you. Are there any further questions of the appellant's counsel? There don't appear to be any. Thank you. The case just argued is submitted for decision.
judges: Hug, Schroeder, Rawlinson